JOSHUA D. HURWIT, Idaho State Bar No. 9527
United States Attorney, District of Idaho
CHRISTINE ENGLAND, Idaho State Bar No. 11390
Assistant United States Attorney, District of Idaho
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (208) 334-1211; Fax: (208) 334-9375
Christine.England@usdoj.gov

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
STEPHEN G. BARTELL, Colorado Bar No. 21760
Assistant Section Chief, Natural Resources Section
stephen.bartell@usdoj.gov
DAVID L. NEGRI, Idaho State Bar No. 6997
Trial Attorney, Natural Resources Section
c/o U.S. Attorney's Office
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (208) 334-1936; Fax: (208) 334-1414
david.negri@usdoj.gov
THOMAS K. SNODGRASS, Colorado Bar No. 31329
Senior Attorney, Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: 303-844-7233; Fax: 303-844-1350
thomas.snodgrass@usdoj.gov

*Counsel for Plaintiff United States of America*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 1:22-cv-00236-DCN |
| ) | |
| Plaintiff, ) | |
| ) | **UNITED STATES' MEMORANDUM IN** |
| v. ) | **SUPPORT OF MOTION FOR** |
| ) | **SUMMARY JUDGMENT** |
| STATE OF IDAHO; IDAHO ) | |
| DEPARTMENT OF WATER RESOURCES, ) | |
| an agency of the State of Idaho; and GARY ) | |
| SPACKMAN, in his official capacity as ) | |
| Director of the Idaho Department of Water | |

Resources,                                              )
                                                        )
                        Defendants,                     )
                                                        )
                        v.                              )
                                                        )
IDAHO HOUSE OF REPRESENTATIVES;                         )
MIKE MOYLE, in his official capacity as                 )
Majority Leader of the House; IDAHO                     )
SENATE; and CHUCK WINDER, in his                        )
official capacity as President Pro Tempore of           )
the Senate.                                             )
_____              )

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................ 3

    A.  The Federal Grazing Program ............................................................... 3

           i.  The BLM Grazing Program ................................................. 3

           ii.  The Forest Service Grazing Program and Grazing on Other Federal Lands .................................................... 4

           iii.  Idaho Law has Long Recognized Federal-Owned Stockwater Rights ................................................. 4

    B.  The Snake River Basin Adjudication and Federal Stockwater Rights ................. 5

    C.  Idaho's Legislation Targeting Federal Stockwater Rights..................... 9

    D.  IDWR's Show-Cause Orders ............................................................. 12

III.  LEGAL BACKGROUND ............................................................................. 14

    A.  The Supremacy Clause and Intergovernmental Immunity ..................... 14

    B.  Sovereign Immunity and the McCarran Amendment ........................... 15

    C.  The Property Clause ............................................................................ 16

    D.  The Contract Clause ............................................................................ 17

    E.  The Retroactivity Clause of the Idaho Constitution ............................ 17

IV.  STANDARD OF REVIEW ........................................................................... 17

V.  ARGUMENT ................................................................................................... 18

        1.  The Idaho Statutes Discriminate Against the United States in Violation of the Intergovernmental Immunity Doctrine and the Supremacy Clause of the U.S. Constitution.............................. 18

           a.  I.C. § 42-502 discriminates against the United States by requiring ownership of livestock .................................. 20

           b.  I.C. § 42-113(2)(b) discriminates against the United States by making federally-owned stockwater rights appurtenant to private property ........................................................... 21

        c.     I.C. § 42-224 discriminates against the United States by limiting defenses to forfeiture based on an agency relationship ................................................................... 22

        d.     I.C. § 42-504 discriminates against the United States by prohibiting changes to purpose or place of use of federally-held stockwater rights ................................................. 24

    2.     The United States has not waived its sovereign immunity and is therefore not subject to Idaho's forfeiture proceedings ........................... 24

        a.     The Idaho forfeiture proceedings are not within the McCarran Amendment's waiver of sovereign immunity for comprehensive water right adjudications ..................................... 25

        b.     The Idaho forfeiture proceedings are not within the McCarran Amendment's waiver of sovereign immunity for administration of water rights ....................................... 27

    3.     The Recent Changes to Idaho Water Law Impermissibly Interfere with, Restrict, and Seek to Divest the United States of its Property Rights, in Violation of the Property Clause of the U.S. Constitution ....... 31

    4.     The Revised Idaho Statutes Violate the Contract Clause of the United States Constitution ........................................................ 32

    5.     The Revised Idaho Statutes Violate the Retroactivity Clause of the Idaho Constitution ................................................................... 34

    6.     The United States Is Entitled To Permanent Injunctive Relief ................. 36

        a.     The forfeiture proceedings will result in significant negative impacts to the federal grazing program and will limit the availability and use of water on federal lands .............................. 37

        b.     The balance of equities and the public interest support an injunction ................................................................... 41

VI.    CONCLUSION ............................................................................. 43

# TABLE OF AUTHORITIES

*Alden v. Maine,*
   527 U.S. 706 (1999) .......................................................................................................... 25

*Amoco Prod. Co. v Vill. Of Gambell,*
   480 U.S. 531 (1987) .......................................................................................................... 36

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) .......................................................................................................... 18

*Blackburn v. United States,*
   100 F.3d 1426 (9th Cir. 1996) ............................................................................... 18, 19, 25

*Block v. North Dakota,*
   461 U.S. 273 (1983) .......................................................................................................... 15

*Boeing Co. v. Movassaghi,*
   768 F.3d 832 (9th Cir. 2014) ....................................................................................... 15, 18

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988) .......................................................................................................... 32

*Cappaert v. United States,*
   426 U.S. 128 (1976) ....................................................................................................... 6, 16

*Celotex Corp.. v. Catrett,*
   477 U.S. 317, 106 (1986) .................................................................................................. 18

*Cline v. Indus, Maint. Eng'g & Contracting Co.,*
   768 F.3d 832 (9th Cir. 2014) ............................................................................................ 18

*Cnty of Suffolk v. Long Island Lighting Co.,*
   14F. Supp. 2d 260 U.S. (E.D.N.Y. 1998) ......................................................................... 17

*Cty. of Suffolk v. Long Island,*
   14 F. Supp. 2d 260 (E.D.N.Y. 1998) ................................................................................. 33

*Department of State Lands v. Pettibone,*
   702 P. 2d 948 (Mont. 1985) .............................................................................................. 43

*Dugan v. Rank,*
   372 U.S. 609 (1963) ..................................................................................................... 26, 27

*FAA v. Cooper,*
   566 U.S. 284 (2012) .......................................................................................................... 24

*FDIC v. Meyer,*
   510 U.S. 471 (1994) .......................................................................................................... 15

*First Sec. Bank of Blackfoot v. State,*
    291 P. 1064 (Idaho 1930) ................................................................................ 23

*Frisbie v. Sunshine Mining Co.,*
    457 P. 2d 408 (Idaho 1969) ..................................................................... 34, 35

*Geo Grp. Inc. v. Newsom,*
    50 F. 4th 745 (9th Cir. 2022) ......................................................................... 19

*Henderson v. United States,*
    517 U.S. 654 (1996) ......................................................................................... 15

*In re Boyer,*
    73 Idaho 152, 248 P.2d 540 (1952) ............................................................... 29

*In re Srba Case No. 39576,*
    128 Idaho 246, 912 P. 2d 614 (1995) ............................................................. 9

*Joyce Livestock Co. v. United States,*
    156 P.3d 502 (Idaho 2007) .......................................................... 8, 20, 22, 23

*Kern Copters, Inc. v. Allied Helicopter Serv., Inc.,*
    277 F.2d 308 (9th Cir. 1960) .......................................................................... 31

*Kleppe v. New Mexico,*
    426 U.S. 529 (1976) ............................................................................ 16, 31, 32

*Lane v. Pena,*
    518 U.S. 187 (1996) ......................................................................................... 24

*Light v. United States,*
    220 U.S. 523 (1911) ......................................................................................... 43

*Local Number 93, Int'l Assoc. of Firefighters v City of Cleveland,*
    478 U.S. 501 (1986) ......................................................................................... 17

*LU Ranching Co. v. United States,*
    156 P.3d 590 (Idaho 2007) .............................................................................. 8

*Matter of Hidden Springs Trout Ranch,*
    636 P.2d 745 (Idaho 1981) ............................................................................. 35

*Mayo v. United States,*
    319 U.S. 441 (1943) ......................................................................................... 15

*McCulloch v. Maryland,*
    17 U.S. (4 Wheat.) 316 (1819) ........................................................................ 15

*Metro. Water Dist. of S. Cal. v. United States,*
    830 F.2d 139 (9th Cir. 1987) .......................................................................... 29

*Miller v. Jennings,*
    243 F.2d 157 (5th Cir. 1957) .......................................................................... 26

*Moe v. Harger,*
   10 Idaho 302, 77 P. 645 (1904) ........................................................................ 29

*Munns v. Kerry,*
   782 F.3d 402 (9th Cir. 2015) ........................................................................... 24

*North Dakota v. United States,*
   495 U.S. 423 (1990).......................................................................... 15, 19, 22

*Ordonez v. United States,*
   680 F.3d 1135 (9th Cir. 2012) ..................................................................... 15, 24

*Orff v. United States,*
   545 U.S. 596 (2005).......................................................................................... 24

*Orff v. Unites States,*
   358 F.3d 1137 (9th Cir. 2004) ......................................................................... 27

*People of the State of California v. United States,*
   235 F.2d 647 (9th Cir. 1956) ........................................................................... 26

*Public Lands Council v. Babbitt,*
   529 U.S. 728 (2000) ......................................................................................... 10

*Rufo v. Inmates of Suffolk Cty. Jail,*
   502 U.S. (1992)................................................................................................ 17

*S. Delta Water Agency v. United States, Dep't of Interior,*
   767 F.2d 531 (9th Cir. 1985) ..................................................................... 27, 30

*Sagewillow, Inc. v. Idaho Dep't of Water,*
   *Res.,* 138 Idaho 831, 70 P.3d 669 (2003)................................................... 11, 29

*San Luis Obispo Coastkeeper v. U.S. Dep't of the Interior,*
   394 F. Supp. 3d 984 (N.D. Cal. 2019) ........................................................... 30

*Shannon v. United States,*
   160 F. 870 (9th Cir. 1908) ......................................................................... 17, 31

*Sunshine Mining Co.,*
   457 P. 2d 408 (Idaho 1969) ............................................................................ 17

*Sveen v. Melin,*
   138 S. Ct. 1815 (2018)............................................................................... 17, 33

*United States Postal Serv. v. City of Berkeley,*
   228 F. Supp. 3d 963 (N.D. Cal. 2017) ........................................................... 19

*United States v. Bormes,*
   568 U.S. 6 (2012)............................................................................................. 15

*United States v. City of Arcata,*
   629 F.3d 986 (9th Cir. 2010) ........................................................... 15, 18, 19, 25

*United States v. Dist. Court of Cty. of Eagle*,
    401 U.S. 520,91 (1971) .......................................................................... 27

*United States v. Estate of Hage*,
    810 F.3d 712 (9th Cir. 2016) ................................................................ 41

*United States v. Grimaud*,
    220 U.S. 506, 31 (1911) .......................................................................... 4

*United States v. Hennen*,
    300 F. Supp. 256 (D. Nev. 1968) ................................................... 27, 30

*United States v. Idaho*,
    508 U.S. 1 (1993) ......................................................................16, 24, 25

*United States v. Idaho*,
    959 P.2d 449 (Idaho 1998) ...................................................................... 5

*United States v. Lewis County*,
    175 F.3d 671 (9th Cir. 1999) ................................................................ 30

*United States v. Mitchell*,
    463 U.S. 206 (1983) ............................................................................. 15

*United States v. Navajo Nation*,
    537 U.S. 488 (2003) ............................................................................. 15

*United States v. Orr Water Ditch Co.*,
    256 F.3d 935 (9th Cir. 2001) ................................................................ 31

*United States v. Park Place Assocs., Ltd.*,
    563 F.3d 907 (9th Cir. 2009) ................................................................ 24

*United States v. Sherwood*,
    312 U.S. 584 (1941) ............................................................................. 16

*United States v. State Engineer*,
    27 P.3d 51 (Nevada 2001) ............................................................. 18, 38

*United States v. Washinton*,
    142 S. Ct. 1976 (2022) ......................................................................... 18

*Univ. of Haw. Prof'l Assembly v. Cayetano*,
    183 F.3d 1096 (9th Cir. 1999) .............................................................. 42

*Washington v. Unites States*,
    460 U.S. 536, 103 (1983) ..................................................................... 19

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ............................................................................. 42

*Western Watersheds Project v. Kraayenbrink*,
    538 F. Supp. 2d 1302 (D. Idaho 2008) ................................................... 3

*Winter v NRDC*,
 555 U.S. 7, 129 (2008) ................................................................ 36, 41

*Wyoming v. United States*,
 933 F. Supp. 1030 (D. Wyo. 1996) ................................................ 30

*Zezi v. Lightfoot*,
 57 Idaho 707, 68 P.2d 50 (1937) ................................................... 11

**Statutes**

16 U.S.C. § 551 ................................................................................... 4

16 U.S.C. § 580*l* ................................................................................ 4

43 U.S.C. § 141 ................................................................................ 13

43 U.S.C. § 1751 (b)(1) ................................................................... 40

43 U.S.C. § 300 ................................................................................ 13

43 U.S.C. § 315 .................................................................................. 3

43 U.S.C. § 315-315c ......................................................................... 3

43 U.S.C. § 315b .............................................................................. 10

43 U.S.C. § 315i ............................................................................... 40

43 U.S.C. § 666 ................................................................................ 16

43 U.S.C. § 666(a) ...................................................................... 16, 25

43 U.S.C. § 666(a)(2) ....................................................................... 27

Idaho Code § 42-101 (2022) ...................................................... 10, 21

Idaho Code § 42-113 (2022) .......................................................... 1, 2

Idaho Code § 42-113(2) (2022) ....................................................... 10

Idaho Code § 42-113(2)(b) (2022) ........................................ 10, 21, 34

Idaho Code § 42-222 (2022) ........................................... 11, 24, 35, 36

Idaho Code § 42-224 (2022) .................. 1, 2, 12, 13, 22, 23, 35, 40, 41

Idaho Code § 42-501 (2022) ........................................... 1, 5, 9, 10, 28

Idaho Code § 42-502 (2022) ................................................. 2, 9, 20, 21

Idaho Code § 42-504 (2022) ................................................... 11, 24, 35

Nev. Rev. Stat. Ann. § 533.503 (2021) ............................................ 38

**Other Authorities**

48 Idaho L. Rev. 419 (2012) ........................................................................................ 29

H.B. 592 ........................................................................................................................ 11

H.B. 608 ........................................................................................................................ 12

Idaho Const. art. XI, § 12 ..................................................................................... 17, 34

Idaho Const. art. XV, § 3 .............................................................................................. 6

U.S. Const. art. I, § 10 cl. 1 ........................................................................................ 32

U.S. Const. art. IV, § 3, cl. 2 ................................................................................ 16, 31

U.S. Const. art. VI, cl. 2 ............................................................................................. 14

## I.    INTRODUCTION

The United States owns and manages millions of acres of land within the State of Idaho on behalf of the American people and it makes most of those acres available for livestock grazing by federal permittees.  These permittees utilize the federal lands to graze and water their livestock, support the Nation's food supply, and contribute to the socio-economic stability of local communities as well as the State.  In the western United States, including Idaho, livestock grazing by permittees through federal grazing permits is a vital component of their ranch operations and also contributes to the maintenance of open space.

To enable this federal grazing program, the United States holds thousands of water rights that have been decreed or licensed for use by livestock on federal grazing allotments ("stockwater rights").  Water from these stockwater rights is generally available for use by the grazing permitees on the federal lands where the water right is located.  Over 24,000 stockwater rights have been decreed to the United States by court order and are relied upon to support the federal-lands grazing program in Idaho.[1]

A series of Idaho statutes, enacted in the last five years and codified primarily at Idaho Code ("I.C.") §§ 42-113,  42-224 and 42-501 through -507, threaten to forfeit these federally-owned stockwater rights and otherwise discriminate against the United States and, as a result, undermine the congressionally authorized federal grazing program.  These Idaho statutes seek to prohibit any "agency of the federal government" from acquiring stockwater rights unless the agency itself owns livestock; make certain stockwater rights associated with federal lands appurtenant to the private property of federal permittees, rather than to the place of use on

---

[1] Approximately 6,500 of these are based on federal law with the remainder based on state law. Price Decl. ¶ 10; Conant Decl. ¶ 13.

**U.S. MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - Page 1**

federal lands; and establish a framework for widespread forfeiture of existing federally-owned

stockwater rights.  *See* I.C. §§ 42-113(2)(b),  42-224, 42-502.   In short, Idaho's new statutes are

seeking to force the forfeiture of crucially important stockwater rights that have been owned by

the United States for, in some instances, over 100 years.

On May 13, 2022, relying on these statutes, the State of Idaho and the Idaho Department

of Water Resources ("IDWR"), acting through the Director of IDWR (collectively,

"Defendants"), issued three show-cause orders requiring the United States, acting through the

United States Bureau of Land Management ("BLM"), to show cause why fifty-seven federally-

owned stockwater rights should not be forfeited.  *See* Ex. 1 (Am. Order to Show Cause, Docket

No. P-OSC-2021-001 (Crane Creek Allotment); Am. Order to Show Cause, Docket No. P-OSC-

2021-002 (Paddock Valley Allotment); Am. Order to Show Cause, Docket No. P-OSC-2021-004

(Butcher Bar and China Creek Allotments)) (collectively, "May 2022 Orders").  On June 22,

2022, also as a direct result of the enactment of these Idaho statutes, Defendants issued a fourth

show-cause order requiring the United States, acting through the U.S. Department of Agriculture,

Forest Service ("Forest Service"), to show cause why eleven federally-owned stockwater rights

should not be forfeited.  *See* Ex. 2 (Am. Order to Show Cause, Docket No. P-OSC-2022-001

(Fourth of July Creek Allotment)) ("June 2022 Order").

Idaho's new laws unlawfully discriminate against the United States and attempt to

improperly divest it of federal property in violation of the Supremacy, Property, and Contract

Clauses of the United States Constitution, the principle of federal sovereign immunity, and the

Retroactivity Clause of the Idaho Constitution.  The facts establishing these legal infirmities are

undisputed, and summary judgment should be granted in favor of the United States.

## II.     BACKGROUND

### A.  The Federal Grazing Program

#### i.    The BLM Grazing Program

Federal law specifically authorizes stockwatering use on BLM-managed lands under the Taylor Grazing Act of 1934.  That statute authorizes the Secretary of the Interior to establish grazing districts and regulate their use.  43 U.S.C. § 315.  It also requires the Secretary to (a) protect and preserve the land and resources within each grazing district; (b) specify the amount of grazing permitted in each district; (c) issue permits for grazing; and (d) regulate the construction of wells, reservoirs and other improvements necessary to the care and management of the permitted livestock.  43 U.S.C. § 315-315c.  The BLM grazing program is administered under regulations found at 43 C.F.R. Part 4100 (2005).[2]

The basic unit of the BLM's livestock grazing program is an allotment, which is an area of public land designated for grazing and made available via permits or leases, typically for renewable ten-year terms.  BLM grazing allotments in Idaho can vary in size from a few hundred acres to hundreds of thousands of acres.  BLM may authorize grazing for a single permittee or multiple permittees within a single allotment.  Allotments on federal lands managed by BLM are not exclusively devoted to livestock grazing; rather, such lands are generally concurrently managed for other purposes, ranging from recreation, to mineral development, to treaty-protected Native American uses.  Decl. of Fredric W. Price ("Price Decl.") ¶ 13(a).

---

[2] BLM's 2006 amendments to the grazing regulations, 71 Fed. Reg. 39,402 (July 12, 2006), were enjoined in their entirety by court order. *See W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302 (D. Idaho 2008), *aff'd in relevant part*, 632 F.3d 472 (9th Cir. 2011), *cert. denied*, 565 U.S. 928 (2011).  Thus, citations to the grazing regulations will be to the 2005 Code of Federal Regulations, unless otherwise indicated.

A variety of water sources, including natural streams and artificial ponds or troughs fed by water pipelines, may provide water for livestock on BLM grazing allotments.  In Idaho, it is not uncommon for a water pipeline system to provide water to multiple grazing allotments.  *Id.* ¶ 13(b).

        ii.   The Forest Service Grazing Program and Grazing on Other Federal Lands

The Organic Administration Act of 1897, 16 U.S.C. § 551,  authorizes the Forest Service to regulate occupancy and use of National Forest System ("NFS") lands, and the Granger-Thye Act of 1950, 16 U.S.C. § 580*l*,  specifically provides for the issuance of livestock grazing permits on NFS lands.  The Supreme Court affirmed the Forest Service's authority to regulate grazing on NFS lands over a century ago.  *United States v. Grimaud*, 220 U.S. 506 (1911). Through its regulatory permitting process, the Forest Service administers and controls many aspects of domestic livestock grazing on the federal lands it manages, including limiting the numbers and location of stock and authorizing, funding, facilitating, and/or constructing wells, reservoirs and other water developments.  Forest Service administration of stockwater rights has the important benefit of allowing efficient use of water resources by multiple or successive permittees on the same allotment.  Decl. of Kathryn J. Conant ("Conant Decl.") ¶¶ 8, 13.

Other federal agencies, such as the National Park Service, the Fish and Wildlife Service, the Bureau of Reclamation, and the Department of Energy, also manage federal lands within Idaho that are neither BLM nor NFS lands.  Some of these agencies allow grazing on certain of those lands and hold water rights to support their grazing programs.  Price Decl. ¶ 8.  Those grazing programs are managed under other provisions of federal law.

        iii. Idaho Law has Long Recognized Federal-Owned Stockwater Rights

The Idaho Supreme Court has recognized the critical importance of federally-owned

water rights to the federal grazing program, noting that they are necessary "to ensure the perpetual use of the water for stockwatering purposes by whichever member of the public happens at any time to have the grazing permit."  *United States v. State of Idaho*, 959 P.2d 449, 452-53 (Idaho 1998).

From its enactment in 1939 until its repeal by the Idaho legislature in 2017, former Idaho statute section 42-501 authorized the BLM to "appropriate for the purpose of watering livestock any water not otherwise appropriated, on the public domain."  Former I.C. § 42-501  (repealed 2017).  During that time period, like today, the United States owned few livestock; rather, the vast majority of livestock were privately owned and authorized to graze on federal land.  As explained further below, the Snake River Basin Adjudication ("SRBA"), which began in 1987 and culminated in 2014, decreed thousands of stockwater rights to the United States for use by federally-permitted, but privately-owned, livestock.  Many of these decrees have priority dates pre-dating the enactment of section 42-501 of the Idaho statutes in 1939, confirming uses of these water sources and water rights perfected by the United States even prior to that date.[3]

### B.  The Snake River Basin Adjudication and Federal Stockwater Rights

The Snake River watershed is the tenth largest watershed in North America and covers 108,000 square miles in portions of six states (Wyoming, Idaho, Nevada, Utah, Oregon, and Washington).  The largest part of the watershed is located in Idaho.  The State commenced the SRBA as a general stream adjudication on November 19, 1987.  In the SRBA, the United States filed claims for thousands of water rights.  Following many years of litigation, over 24,000 stockwater rights were decreed to the United States (over 15,000 BLM stockwater decrees and approximately 9,000 Forest Service stockwater decrees), many through settlement – including

---

[3] A water right's priority date is generally the date of the first use of the water.

with the State of Idaho.  Price Decl. ¶¶ 10, 22, 23; Conant Decl. ¶ 13.  The United States

obtained some of these rights pursuant to Idaho state law ("state-based rights"), and others

pursuant to federal laws that reserved them ("federal reserved rights").  The SRBA decreed to the

United States these state-based stockwater rights based on the consumption of water by livestock

owned by federal grazing permittees.[4]

      Many of the stockwater rights held by the United States, including those decreed to it by

the SRBA court, were created by putting water to beneficial use without obtaining a prior permit

or license from the IDWR.  Water rights of this kind, which are based directly on the Idaho

Constitution, are commonly called "constitutional" water rights.  *See generally* IDAHO CONST.

art. XV, § 3  ("The right to divert and appropriate the unappropriated waters of any natural

stream to beneficial uses, shall never be denied, except that the state may regulate and limit the

use thereof for power purposes.").  In contrast, water rights based on a permit or license are

called "statutory" or "licensed" water rights.  Idaho law, as of 1963 for groundwater rights and as

of 1971 for surface water rights, required most water users to apply for permits and licenses.  I.C.

§§ 42-229 (groundwater); 42-103 (surface water).  Finally, federal reserved water rights are

water rights which are established as a matter of federal law upon reservation of federal lands

from the public domain independent of state law.  *See*, *e.g.*, *Cappaert v. United States*, 426 U.S.

128 (1976).

      In the SRBA, the United States often claimed state-based stockwater rights even when

federal reserved rights might also have been available, because the constitutional method of

---

[4] All of the water rights listed in the orders to show cause are decreed water rights, except for six
water rights listed in the latest order: 75-4236, 75-4241, 75-7672, 75-7279, 75-7288, and 75-
7335, which are "licensed" or "statutory" rights. "Licensed" rights are rights obtained through
filing for a permit and license under Idaho law.  *See* I.C. § 42-201.  "Statutory" rights are
constitutional rights for which a statutory claim has been filed under I.C. § 42-243.

obtaining state-based water rights provided the earliest priority date for the rights.  The State and

a small group of federal grazing permittees contested many of the United States' claims during

the SRBA, and many of the United States' decrees resulted from settlements filed with and

accepted by the SRBA court, including some with the State of Idaho.  Price Decl. ¶¶ 10, 22, 23.

56 of the 57 BLM stockwater rights at issue in this proceeding were the subject of settlements

with the State of Idaho.  *Id*. ¶ 22.

In 2002, the United States reached a court-approved settlement in the SRBA with a group

of permittees known informally as the Federal Stockwater Group ("FSG").  The FSG settlement

allowed both the United States and the FSG permittees to hold stockwater rights on water

sources used by the permittees, with the permittees' rights typically accorded a senior priority

date.  The settlement included explicit agreements by the permittees to withdraw their objections

to the United States' stockwater claims, to withdraw their challenges to stockwater decrees

already issued to the United States, and to refrain from challenges to any other stockwater

decrees issued to the United States.  Price Decl. ¶¶ 22.

The FSG and other settlements, along with the United States' uncontested claims,

resulted in the adjudication and decree of thousands of stockwater rights to the United States in

the SRBA, through a series of partial decrees issued under Rule 54(b)(1) of the Idaho Rules of

Civil Procedure ("Certificate of Partial Judgment as Final").  This system of issuing fully binding

partial decrees allowed the SRBA to progress with partial decrees for individual claims rather

than requiring the full adjudication of all claims in the entire Snake River watershed prior to

issuing any decree.  In this way, the SRBA court decreed to the United States over 15,000

stockwater rights associated with lands managed by the BLM, of which approximately 6,485

were for instream stockwatering (that is, consumption of water by livestock directly from a water

source, without the use of a pipeline or other development).  Price Decl. ¶ 10.  Of the remaining

water rights on BLM-managed lands, approximately 2,725 were for stockwatering at developed

water sources (such as troughs, stockponds, or other developments) and approximately 6,500

were decreed under federal law as federal reserved water rights.  *Id.*  The SRBA court also

decreed to the United States nearly 9,000 stockwater rights associated with lands managed by the

Forest Service, over half of which were for stockwatering at developed water sources.  Conant

Decl. ¶ 13.  Where a stockwater source is developed on federal land managed by either the BLM

or Forest Service, federal appropriations often fund the development.  Conant Decl. ¶ 13; Price

Decl. ¶ 19.

      A few federal permittees chose not to settle, however, and instead continued to pursue

litigation.  In 2007, the Idaho Supreme Court ruled in favor of one such permittee in *Joyce*

*Livestock Co. v. United States*, 156 P.3d 502 (Idaho 2007).[5]  *Joyce Livestock* dealt exclusively

with claims related to a single class of stockwater rights – constitutional stockwater rights

acquired through instream stockwatering (without developments of any kind) – and held that,

"[u]nder Idaho law, a landowner does not own a water right obtained by an appropriator using

the land with the landowner's permission unless the appropriator was acting as agent of the

owner in obtaining that water right."  *Id.* at 519.

      The *Joyce Livestock* decision did not affect any of the water rights that had already been

decreed to the United States.  In fact, the SRBA court continued to decree claims sought by the

United States for constitutional instream stockwater rights even after *Joyce Livestock*, noting that

"[u]nder the ruling in *Joyce*, there are still factual scenarios by which it would be legally possible

---

[5] In a companion case decided the same day, the court applied its reasoning in *Joyce Livestock* to
similar facts.  *LU Ranching Co. v. United States*, 156 P.3d 590 (Idaho 2007).

for the United States to acquire [an instream constitutional] water right[,] such as through an agency relationship or agreement with the appropriator of the water right."  Price Decl. ¶ 4, Ex. 4 at 2 (*In re SRBA*, Case No. 39576, #74-15468, slip op. (Idaho 5th Jud. Dist. Ct. Feb. 28, 2007)) .

On August 25, 2014, the SRBA court entered a Final Unified Decree that incorporated all partial decrees into one final order covering 158,600 water rights.  Final Unified Decree, *In re SRBA*, Case No. 39576 (Idaho 5th Jud. Dist. Ct., Aug. 25, 2014) ; s*ee* Price Decl. ¶ 10.  This Final Unified Decree is conclusive as to the nature and extent of all water rights within the Snake River Basin with a priority date prior to November 19, 1987, except for a group of deferred claims that were not at issue in the SRBA at the time of the entry of the decree.  Final Unified Decree at 7, ¶ 5.

### C.  Idaho's Legislation Targeting Federal Stockwater Rights.

As explained in detail in the United States' Statement of Undisputed Facts ("Statement"), the State of Idaho, beginning in 2017 and continuing through 2022, enacted a series of discriminatory amendments to its water laws related to federal stockwater rights.  Statement of Undisputed Facts ¶¶ 13-33.  These amendments have led directly to the currently pending forfeiture proceedings.

Many of these provisions apply only to the United States or to stockwater rights on federal lands.  In 2017, the State amended section 42-502 to declare that "[n]o agency of the federal government shall acquire a stockwater right unless the agency owns livestock and puts the water to beneficial use."  *See* I.C. § 42-502; Statement ¶ 14.   At the same time, the State repealed a provision in effect since 1939 that explicitly provided for appropriation of stockwater rights by the BLM.  *See* I.C. § 42-501 (2016)  ("The bureau of land management of the department of interior of the United States may appropriate for the purpose of watering livestock

any water not otherwise appropriated, on the public domain."); Statement ¶ 14.  In 2018, the State amended section 42-501 to express "the intent of the Legislature" that stockwater rights held by the United States "are subject to forfeiture."  As applied by IDWR, this legislation subjects federally-owned stockwater rights to forfeiture, without any change in their use from the time they were decreed, as further discussed below.  *See* I.C. § 42-501; Statement ¶ 14.

In 2018, the State also amended section 42-113, a provision of Idaho Code affecting "rights to the use of water for in-stream or out-of-stream livestock purpose, associated with grazing on federally owned or managed land, established under the diversion and application to beneficial use method of appropriation" – that is, to constitutional stockwater rights located on federal lands, whether owned by the United States or by its permittees.  *See* I.C. § 42-113(2) ; Statement ¶¶ 22-24.  First, the State added a new provision, providing that "[t]he water right shall be an appurtenance to the base property."  *See* I.C. § 42-113(2)(b). [6]  Thus, under current Idaho law, only federally-owned stockwater rights (not privately- or State-held water rights) are appurtenant to the permittees' privately-owned base property, rather than to the federally-owned lands that constitute their place of use, as is generally the rule in Idaho.  *See* I.C. § 42-101 (water rights "shall become the complement of, or one of the appurtenances of, the land or other thing to which, through necessity, said water is being applied").  Second, the State amended the statute

---

[6]  Under the Taylor Grazing Act and associated regulations, the federal government gives a preference to owners of stock who own "base property," *i.e.*, private land or water rights sufficient to support their herds on federal lands.  *See, e.g.*, *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 734 (2000); 43 U.S.C. § 315b.  "Base property" is defined for Forest Service purposes as "land and improvements owned and used by the permittee for a farm or ranch operation and specifically designated by him to qualify for a term grazing permit."  36 C.F.R. § 222.1(b)(3).  The BLM similarly defines "base property," for purposes of BLM grazing permits, as "(1) Land that has the capability to produce crops or forage that can be used to support authorized livestock for a specified period of the year, or (2) water that is suitable for consumption by livestock and is available and accessible, to the authorized livestock when the public lands are used for livestock grazing."  43 C.F.R. § 4100.0-5 (2005).

to purportedly authorize the owner of the base property to convey the water right without federal approval, if the federal grazing permit "is transferred or otherwise conveyed to a new owner". *Id.*

In 2020, the State modified I.C. § 42-504 by removing the ability of the State to approve, only in regards to stockwatering rights held by "an agency of the federal government" or located on a "federal grazing allotment," a purpose of use for the water right other than "watering of livestock." *See* I.C. § 42-504; Statement ¶ 30.  This amendment also limited in perpetuity the place of use for such stockwater rights to "the federal grazing allotment that is the place of use for that stockwater right." *Id.*

In tandem with these revisions, the State also made substantial amendments to its water rights forfeiture provisions, including amendments that specifically target stockwater rights held by the United States.  Before 2018, a longstanding provision of the Idaho Code, section 42-222(2), provided that "[a]ll rights to the use of water acquired under this chapter or otherwise shall be lost and forfeited by a failure for the term of five (5) years to apply it to the beneficial use for which it was appropriated."  However, no specific statutory procedures existed for applying I.C. § 42-222(2) , and the provision was rarely applied.  In the words of the Idaho Supreme Court, before the enactment of H.B. 592, "abandonments and forfeitures [were] not favored" under Idaho law.  *Sagewillow, Inc. v. Idaho Dep't of Water Res.*, 70 P.3d 669, 674 (Idaho 2003) (citing *Zezi v. Lightfoot*, 68 P.2d 50 (Idaho 1937)).

In 2018, the State amended its water laws to provide a specific administrative procedure to forfeit only federally-held water rights. *See* Statement ¶¶ 15-21.  Although these provisions were in turn amended in 2020 and 2022 to facially apply to stockwater rights held by parties in addition to the United States, they still focus on only stockwater rights, not water rights for other

uses of water, and they contain provisions related to only stockwater rights located on "federal or state grazing lands." For such rights, a special notice provision is included, requiring notice of the forfeiture proceedings not only to the stockwater owner, but also to "any holder or holders of any livestock grazing permit or lease for said lands." I.C. § 42-224(4) . In addition, IDWR "shall not issue an order to show cause where the director has or receives written evidence signed by the principal and the agent, prior to issuance of said order, that a principal/agent relationship existed during the five (5) year term [preceding the date of the petition] or currently exists between the owners of the water right as principal and a permittee or lessee as agent for the purpose of obtaining or maintaining the water right." *Id*.

Finally, the State also enacted certain provisions that appear intended to insulate the State's legislative changes from judicial review in federal court. In particular, H.B. 608 now provides that any determination by IDWR that a stockwater right has been forfeited "shall have no legal effect" on its own. *See* I.C. § 42-224(9)  (2022). Instead, such a determination triggers a mandatory provision according to which "the state of Idaho, by and through the office of the attorney general, must initiate a civil action" in State court within sixty days of IDWR's determination. *See* I.C. § 42-224(10)  (2022). The statute further provides that IDWR "shall not be a party" to these mandatory litigations, but its determination of forfeiture "shall constitute prima facie evidence that the right has been forfeited." *See* I.C. § 42-224(11)  (2022).

### D.  IDWR's Show-Cause Orders

In 2021, Idaho issued its first order to the Forest Service to show cause why forty-five stockwater rights held by the United States have not been lost through forfeiture. Conant Decl. ¶ 16. Two weeks after issuance of the order, one of the grazing permittees on the grazing allotment on which the stockwater rights are located signed an agency agreement with the Forest

Service, and the show-cause order was withdrawn.[7]  *Id.*

On April 25, 2022, IDWR issued three of the orders presently before this Court, requiring the United States to show cause within 21 days why eighty-one federally-owned stockwater rights used on lands managed by the BLM should not be forfeited ("April 2022 Orders").  Price Decl. ¶ 39.  On May 10, 2022, the United States informed the Idaho Attorney General's office that twenty-four of the federally-owned stockwater rights listed in the April 2022 Orders were decreed based on federal law and not state law as the orders presumed.[8]  On May 13, IDWR issued the May 2022 Orders, withdrawing and amending the three Orders, deleting the twenty-four federal water rights, and stating that "[t]hese federal water rights should not have been included in the list of water rights subject to the order to show cause."  *See* I.C. § 42-224(14) ("This section applies to all stockwater rights except those stock water rights decreed to the United States based on federal law.").  Ex. 1; Price Decl. ¶ 41.  The May 2022 Orders were then served on the United States on May 16, 2022.  Under I.C. § 42-224(6) and (7) , the United States had until June 6, 2022 to respond to the orders, or face an administrative forfeiture determination by default.

To avoid this default determination, on June 3, the United States, through the Office of the Solicitor of the Department of the Interior, filed a letter specially appearing before IDWR to request hearings, but noting that the United States contests jurisdiction and requesting that the

---

[7] The permittee and the Forest Service entered into this agency agreement before the Idaho legislature amended its forfeiture statute in 2022 to require that evidence of an agency agreement pre-date the issuance of a show-cause order.  *See* I.C. § 42-224(4).

[8] The federal-law basis for these water rights is a 1926 Presidential Executive Order, Public Water Reserve 107, issued pursuant to the Pickett Act, 43 U.S.C. § 141 (repealed 1976), and the Stock Raising Homestead Act, 43 U.S.C. § 300 (repealed 1976), that reserved "every smallest legal subdivision of the public land surveys which is vacant unappropriated unreserved public land and contains a spring or water hole."

hearings be stayed pending completion of this litigation.  On June 24, IDWR issued orders

staying all three administrative hearings, "pending the outcome of [the instant case before this

Court] or until otherwise ordered by the Director."  *E.g.*, https://idwr.idaho.gov/wp-

content/uploads/sites/2/legal/P-OSC-2021-004/P-OSC-2021-004-20220624-Order-Granting-

Request-for-Hearing-Order-Staying-Hearing.pdf at 2.

On June 22, 2022, IDWR issued a fourth show-cause order requiring the United States to

show cause within twenty-one days why eleven federally-owned stockwater rights used on lands

managed by the Forest Service should not be forfeited.  Ex. 2 (June 2022 Order); Conant Decl. ¶

17.  As with the May 2022 Orders, the United States specially appeared before IDWR, this time

via a letter from the Office of General Counsel of the Department of Agriculture, and IDWR

subsequently stayed the administrative hearing "pending the outcome of [the instant case before

this Court] or until otherwise ordered by the Director."  https://idwr.idaho.gov/wp-

content/uploads/sites/2/legal/P-OSC-2022-001/P-OSC-2022-001-20220728-Order-Granting-

Request-for-Hearing-Order-Staying-Hearing-Fourth-of-July-Creek-Allotment.pdf at 2.

## III.   LEGAL BACKGROUND

### A.     The Supremacy Clause and Intergovernmental Immunity

The Supremacy Clause of the U.S. Constitution provides: "This Constitution, and the

Laws of the United States which shall be made in Pursuance thereof . . . , shall be the supreme

Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the

Constitution or Laws of any State to the Contrary notwithstanding."  U.S. CONST. art. VI, cl. 2.

A state law "may run afoul of the Supremacy Clause in two distinct ways: The law may regulate

the Government directly or discriminate against it" (a violation of the doctrine of

intergovernmental immunity), or the law "may conflict with an affirmative command of

Congress" (preemption).[9]  *North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality opinion).

The doctrine of intergovernmental immunity arose from *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), "which established that 'the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government.'" *United States v. Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (quoting *McCulloch*, 17 U.S. at 436).  Intergovernmental immunity ensures that the "activities of the Federal Government are free from regulation by any state." *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014) (quoting *Mayo v. United States*, 319 U.S. 441, 445 (1943)).

### B.      Sovereign Immunity and the McCarran Amendment

As a sovereign, the United States and its agencies may only be sued when Congress has consented to suit.  *See, e.g.*, *United States v. Bormes*, 568 U.S. 6, 9-10 (2012);  *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 280 (1983).  "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *Navajo Nation*, 537 U.S. 488, 502 (2003) (quoting *United States v. Mitchell*, 463 U.S. 206, 212 (1983)); *Ordonez v. United States*, 680 F.3d 1135, 1138 (9th Cir. 2012) (same).  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (citations omitted).  "Sovereign immunity is by nature jurisdictional, and the terms of the United States' consent to be sued in any court define [and thereby limit] that court's jurisdiction to entertain the suit." *Henderson v.*

---

[9] Preemption is not alleged through this motion.

*United States*, 517 U.S. 654, 675-76 (1996) (Thomas, J., dissenting) (internal citations and quotation marks omitted) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).

In 1952, Congress enacted the McCarran Amendment to facilitate the comprehensive determinations of water rights by allowing the United States to be "joined as a party in a state-court general water rights' adjudication." *Cappaert v. United States*, 426 U.S. 128, 146 (1976); *see also* 43 U.S.C. § 666. Section (a) of the statute provides:

> Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the extent as a private individual under like circumstances: *Provided*, That no judgment for costs shall be entered against the United States in any such suit.

43 U.S.C. § 666(a). Because the McCarran Amendment constitutes a waiver of the United States' sovereign immunity, it "must be strictly construed in favor of the United States" and "not enlarged beyond what the language of the statute requires." *United States v. Idaho, ex rel. Dir., Idaho Dep't of Water Res.*, 508 U.S. 1, 6-7 (1993) (citations omitted).

## C. The Property Clause

The Property Clause of the U.S. Constitution specifies that "Congress shall have the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST. art. IV, § 3, cl. 2. The Supreme Court has consistently interpreted the power conferred to the federal government under the Property Clause to manage its own property to be expansive and "without limitations." *Kleppe v. New*

*Mexico*, 426 U.S. 529, 539 (1976) (citing cases); *see also Shannon v. United States*, 160 F. 870, 875 (9th Cir. 1908).

D. **The Contract Clause**

The Contract Clause, U.S. CONST. art. I, § 10, cl. 1, provides that "no State shall . . .  pass any . . . Law impairing the Obligation of Contracts . . . ."  The Clause applies to any kind of contract, *see Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018),  and includes both settlement agreements and consent decrees.  *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992)  ("A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature."); *Local Number 93, Int'l Assoc. of Firefighters v. City of Cleveland*, 478 U.S. 501, 519 (1986)  (finding consent judgments to be "hybrids" of both contracts and judgments); *Cnty. of Suffolk v. Long Island Lighting Co*., 14 F. Supp. 2d 260, 267 (E.D.N.Y. 1998)  (applying Contract Clause to settlement agreements).

E. **The Retroactivity Clause of the Idaho Constitution**

The Retroactivity Clause of the Idaho Constitution provides that "[t]he legislature shall pass no law for the benefit of a railroad, or other corporation, or any individual, or association of individuals retroactive in its operation."  IDAHO CONST. art. XI, § 12.   A law is retroactive "when it operates upon . . . rights which have been acquired . . . prior to its passage."  *Frisbie v. Sunshine Mining Co.*, 457 P. 2d 408, 411 (Idaho 1969).

IV. **STANDARD OF REVIEW**

Summary judgment is appropriate when the movant demonstrates that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law, as shown by the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of

identifying the evidence that it believes forms the basis for its motion and demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000).

A party opposing a summary judgment motion may not rest upon the allegations or denials in its pleadings, Fed. R. Civ. P. 56(e), but must demonstrate the existence of facts that could support a finder of fact ruling in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 49 (1986). Summary judgment should be entered against a party that fails to produce evidence on an element on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

## V.     ARGUMENT

### 1.     The Idaho Statutes Discriminate Against the United States in Violation of the Intergovernmental Immunity Doctrine and the Supremacy Clause of the U.S. Constitution.

The Ninth Circuit has consistently invalidated state laws that "regulate the United States directly," as well as those that "discriminate against the Federal Government or those with whom it deals." *Boeing*, 768 F.3d at 839 (citation, internal quotation marks and alterations omitted); *accord Arcata*, 629 F.3d at 991; *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996). *Cf. United States v. State Eng'r*, 27 P.3d 51, 54 (Nev. 2001) (concluding that state statute authorizing water permit to applicants "legally entitled to place the livestock on the public lands" must authorize permits to BLM as the landowner). The Supreme Court has stated that it "will find that Congress has authorized regulation that would otherwise violate the Federal Government's intergovernmental immunity 'only when and to the extent there is a clear congressional mandate.'" *United States v. Washington*, 213 L. Ed. 2d 336, 142 S. Ct. 1976, 1984

(2022) (citations omitted), *quoted with approval by Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 762

(9th Cir. 2022).

"The nondiscrimination rule finds its reason in the principle that the States may not

directly obstruct the activities of the Federal Government." *North Dakota*, 495 U.S. at 437–38.

A state law discriminates against the Federal Government and those with whom it deals if "it

treats someone else better than it treats them." *Id.* at 438 (quoting *Washington v. United States*,

460 U.S. 536, 544–45 (1983)); *see also Arcata*, 629 F.3d at 991.  As the Supreme Court recently

explained in *Washington*:

> [A] state law discriminates against the Federal Government or its contractors if it
> "single[s them] out" for less favorable "treatment," *Washington v. United States*,
> 460 U.S. 536, 546, 103 S.Ct. 1344, 75 L.Ed.2d 264 (1983), or if it regulates them
> unfavorably on some basis related to their governmental "status," *North Dakota*,
> 495 U.S., at 438, 110 S.Ct. 1986 (plurality opinion).

*Washington*, 142 S. Ct. at 1984 (invalidating a state law that "explicitly treats federal workers

differently than state or private workers.") (citation omitted).

State laws can discriminate against the federal government even if they do not appear to

do so in the text of the statute. *Arcata,* 629 F.3d at 991 (discussing *Blackburn*, 100 F.3d 1426, as

an example of a court finding that a statute violated intergovernmental immunity principles even

though "it did not target the federal government alone").  And, while a discriminatory *motive*

alone is not enough to violate the intergovernmental immunity doctrine, a facially-neutral statute

may violate the doctrine where "the inevitable effect of a statute" would discriminate against the

United States or its agents and leave them worse off than other regulated entities.  *See U.S.*

*Postal Serv. v. City of Berkeley*, 228 F. Supp. 3d 963, 968-69 (N.D. Cal. 2017) (discussing

*United States v. O'Brien*, 391 U.S. 367 (1968) (finding that City zoning ordinance that appeared

to apply to all private parties "effectively discriminate[d]" against the U.S. Postal Service "because its only effect [was] to frustrate the USPS's attempts to sell the post office")).

         **a.**    **I.C. § 42-502 discriminates against the United States by requiring ownership of livestock.**

Here, the Idaho statutes impermissibly discriminate against the United States in multiple ways. First, I.C. § 42-502 prohibits any "agency of the federal government" from acquiring stockwater rights "unless the agency owns livestock and puts the water to beneficial use." No similar restriction is placed on the State as landowner, nor on private individuals. This prohibition, even if applied prospectively, prejudices the United States by prohibiting it from acquiring new stockwater rights in circumstances where other landowners who do not own livestock could acquire such rights. This language, on its face, targets the United States for discriminatory treatment.

Nor does the *Joyce Livestock* decision require such discrimination.[10] First, as noted above, *Joyce Livestock* applies equally to the United States and other landowners. *See Joyce Livestock*, 156 P.3d at 519 ("Under Idaho law, a landowner does not own a water right obtained by an appropriator using the land with the landowner's permission unless the appropriator was acting as agent of the owner in obtaining that water right."). Moreover, *Joyce Livestock* noted that the prohibition it imposed on landowners acquiring water rights without owning livestock applied only to state-based constitutional stockwater rights – that is, rights acquired before 1971 without a permit from IDWR. *See Joyce Livestock*, 156 P.3d at 520 ("The constitutional method of appropriation and the permit method were two separate means for acquiring water rights."). It

---

[10] While the Idaho Supreme Court, like the Idaho legislature, is subject to the Supremacy Clause, *see* U.S. CONST. art VI cl. 2 ("[T]he Judges in every State shall be bound thereby . . . ."), the United States assumes solely for purposes of this motion that the rule set forth in *Joyce Livestock* is consistent with the Supremacy Clause.

did not apply to licensed rights issued by IDWR.  In fact, in 2015, the Office of the Idaho

Attorney General opined in a memorandum to IDWR that *Joyce Livestock* addresses only the

constitutional method of water right appropriation and thus does not prevent a lessor from

obtaining a water right via the State's licensing process based on a lessee's beneficial use.  *See*

Price Decl. Ex. 5 (Memorandum from Mark F. Cecchini-Beaver to Shelley Keen, "Water rights

on State grazing leases after *Joyce Livestock*" (Aug. 27, 2015)).  Based on this memorandum, it

appears that even after *Joyce Livestock*, landowners *other than the United States* can acquire

new, licensed stockwater rights based on their permittees' use of water to water the permittees'

livestock.[11]  I.C. § 42-502 therefore discriminates explicitly against the United States by

prohibiting the United States – and only the United States – from acquiring new stockwater

rights under these circumstances.

> **b.    I.C. § 42-113(2)(b) discriminates against the United States by making federally-owned stockwater rights appurtenant to private property.**

Second, I.C. § 42-113(2)(b) also discriminates against the United States and its agencies.

It applies only to constitutional stockwater rights "associated with grazing on federally owned or

managed land," and makes such rights appurtenant to the grazing permittees' base property,

rather than to the lands that constitute the place of use, as is generally the rule in Idaho.  *See* I.C.

§ 42-101 (water rights "shall become the complement of, or one of the appurtenances of, the land

or other thing to which, through necessity, said water is being applied"); I.C. § 42-220 ("Water

right licenses . . . shall become appurtenant to, and shall pass with a conveyance of, the land for

which the right of use is granted."); I.C. § 42-1402 ("The right confirmed by such decree . . .

---

[11] The State, in fact, derives substantial benefit from this advantage.  In FY 2019, the State Department of Lands managed 1,127 grazing leases that covered 1,758,213 acres of endowment land.  These leases contributed an estimated 258,315 animal unit months ("AUM") of forage to livestock operations in FY19.  Price Decl. ¶ 12.

shall be appurtenant to and shall become a part of the land on which the water is used"). Section 42-113(2)(b) also provides that "[w]hen a *federal grazing permit* is transferred or otherwise conveyed to a new owner, the associated stockwater rights may also be conveyed and, upon approval of an application for transfer, shall become appurtenant to the new owner's base property." I.C. § 42-113(2)(b) (emphasis added).[12]  Although, as noted above, *Joyce Livestock* held that constitutional, instream stockwater rights *owned by federal grazing permittees* are appurtenant to those permittees' base property, *see Joyce Livestock*, 156 P.3d at 514, the new law further applies to stockwater rights owned by the United States, including rights associated with physical diversions.  Section 42-113(2)(b) therefore discriminates against the United States in violation of the intergovernmental immunity doctrine by treating federally-owned stockwater rights differently than those owned by the State or private parties.  *North Dakota*, 495 U.S. at 438.

> **c.** **I.C. § 42-224 discriminates against the United States by limiting defenses to forfeiture based on an agency relationship.**

Third, I.C. § 42-224 now discriminates against the United States by purporting to limit defenses to forfeiture based on an agency relationship for stockwater rights located on federal lands, whereas such defenses are still available on private lands. These changes now subject federally-owned stockwater rights to forfeiture, without any change in the underlying use of the rights at the time they were decreed in the SRBA.  Indeed, the SRBA court decreed thousands of stockwater rights to the United States based on consumptive use of water by cattle owned by the United States permittees, without evidence of an agency agreement.  However, by now requiring

---

[12] Notably, federal law does not allow a federal grazing permit to be "transferred or otherwise conveyed," but rather provides that when base property is conveyed, the accompanying grazing *preference* is transferred to the new owner of the base property, who may then apply for a grazing permit based on the transferred preference. *See* 43 C.F.R. § 4110.2-3 (2005).

written evidence of an agency relationship between the United States and its permittees, the

legislation, as applied by IDWR, threatens to invalidate thousands of these rights by requiring

that federal agencies own cattle in order to establish beneficial use, absent the production of such

written evidence.

In *Joyce Livestock*, the court recognized the longstanding rule under Idaho law that a

landowner can acquire stockwater rights through the actions of its permittee if "the [permittee]

was acting as agent of the owner" when it watered its livestock.  *See Joyce Livestock*, 156 P.3d at

519; *accord 1st Sec. Bank of Blackfoot v. State*, 291 P. 1064, 1066 (Idaho 1930).  Even after

*Joyce Livestock*, the SRBA continued to decree constitutional stockwater rights to the United

States based in part on this theory, *In Re SRBA*, Case No. 39576, #74-15468, slip op. at 2 (Idaho

Dist. Ct. Feb. 28, 2007).

> Section 42-224 currently provides that IDWR
>
> shall not issue an order to show cause where the director has or receives written
> evidence signed by the principal and the agent, prior to issuance of said order, that
> a principal/agent relationship existed during the five (5) year term [preceding the
> date of the petition] or currently exists between the owners of the water right as
> principal and a permittee or lessee as agent for the purpose of obtaining or
> maintaining the water right."

I.C. § 42-224(4) .  This codification narrows the common-law defense recognized in *Joyce*

*Livestock* by requiring express "written evidence signed by the principal and the agent,"

apparently excluding evidence of an implied principal/agent relationship.  Even more

restrictively, the version of the defense codified in the statute requires the agency relationship

agreement to be signed "prior to issuance of" the show-cause order.  This new requirement

precludes the United States from obtaining and presenting such agreements in response to a

show-cause order, as it did in the case of the October 2021 Order.

      **d.**     **I.C. § 42-504 discriminates against the United States by prohibiting changes to purpose or place of use of federally-held stockwater rights.**

Finally, Idaho Code § 42-504 also singles out the federal government by limiting the United States and its permittees from using stockwater rights "for any purpose other than the watering of livestock on the federal grazing allotment that is the place of use for that stockwater right." I.C. § 42-504.  This statute effectively renders I.C. § 42-222 – which provides an administrative process that is otherwise available to all water right holders to apply for changes to water rights, including changes in purpose and place of use – unavailable to the United States. Federal agencies and their permittees are therefore treated differently (and less favorably due to restrictions on their property rights) than other owners of stockwater rights, who face no such prohibition on changes to the purpose or place of use of stockwatering rights.

For these reasons, each of the laws at issue discriminate against the United States in violation of the Supremacy Clause of the United States Constitution.

      **2.**     **The United States has not waived its sovereign immunity and is therefore not subject to Idaho's forfeiture proceedings**

The United States Supreme Court has repeatedly held that waivers of sovereign immunity must be strictly construed in the Government's favor and must be "'unequivocally expressed' in statutory text." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (citations omitted); *Orff v. United States*, 545 U.S. 596, 601-02 (2005); *Idaho*, 508 U.S. at 6–7 (1993) (citations omitted).  Thus, a waiver of sovereign immunity cannot be implied. *Lane v. Pena*, 518 U.S. 187, 192 (1996); *Munns v. Kerry*, 782 F.3d 402, 412 (9th Cir. 2015) (citation omitted); *Ordonez*, 680 F.3d at 1138 (citation omitted).  Moreover, a plaintiff has the burden of establishing that a specific waiver of sovereign immunity exists. *United States v. Park Place Assocs., Ltd*., 563 F.3d 907, 924 (9th Cir. 2009).

Further, in the absence of such a waiver, "[i]t is unquestioned that the Federal Government retains its . . . immunity from suit . . . in state tribunals . . . ." *Alden v. Maine*, 527 U.S. 706, 749 (1999).  The Supremacy Clause of the United States Constitution is violated where states attempt to exercise jurisdiction over federal agencies or employees without congressional consent.  *See Arcata*, 629 F.3d at 991(citing *Blackburn*, 100 F.3d at 1435).

The State has failed to identify any waiver of sovereign immunity to support the administrative proceedings against the United States.  Assuming that they are relying on the McCarran Amendment, the federal law that provided the basis for the United States participation in the SRBA, *see Idaho*, 508 U.S. at 3-4, such reliance is unavailing.

> a.   **The Idaho forfeiture proceedings are not within the McCarran Amendment's waiver of sovereign immunity for comprehensive water right adjudications.**

The McCarran Amendment provides consent to join the United States as a defendant to any "suit" that falls within two categories: (1) "for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of . . . water rights . . . and the United States is a necessary party to such suit."  43 U.S.C. § 666(a).  The McCarran Amendment, therefore, foreclosed United States' refusal on sovereign immunity grounds to participate in court proceedings adjudicating the relative rights of all other water users on a stream system.  As recognized in the Senate Report on the McCarran Amendment, a decree that does not include all water users can "materially interfere with the lawful and equitable use of water for beneficial use by the other water users," potentially rendering decreed rights insecure.  *See* S. Rep. No. 82-755 at 5-6, 9 (1951).  A failure to include "all water users on a stream . . . cannot help but result in a chaotic situation," seriously jeopardizing a "fair and equitable division of the public waters."  *Id.* at 5.

The McCarran Amendment, accordingly, waived the sovereign immunity of the United States, but only when its participation was necessary to the complete adjudication of competing rights on a river system.  Beginning with *Dugan v. Rank*, 372 U.S. 609 (1963), the United States Supreme Court has emphasized that the McCarran Amendment permits joinder of the United States only in a "general adjudication of all the rights of various owners on a given stream" establishing priorities between claimants.  372 U.S. at 618-19 (internal quotation marks and citation omitted).  *See also Miller v. Jennings*, 243 F.2d 157, 159 (5th Cir. 1957) ("The United States has not given its consent to be joined as a defendant in every suit involving water rights . . . . There can be an adjudication of rights with respect to the upper Rio Grande only in a proceeding where all persons who have rights are before the tribunal."); *People of the State of California v. United States*, 235 F.2d 647, 663 (9th Cir. 1956).  The McCarran Amendment does not authorize "a private suit to determine water rights solely between" the United States and a third party.  *Dugan*, 372 U.S. at 618.

The forfeiture proceedings initiated by IDWR do not fall within the McCarran Amendment's waiver of sovereign immunity for joinder to comprehensive general stream adjudications.  These proceedings target only federal water rights.  Such a limited proceeding, which does not include "all persons who have rights . . . before the tribunal," is not in any respect a comprehensive adjudication and thus fails to comply with McCarran Amendment requirements.  *Miller*, 243 F.2d at 159.  The Idaho forfeiture proceedings are nothing like the SRBA, a comprehensive water rights adjudication that resulted in a final decree that included the federal water rights at issue here.

The federal stockwater rights at issue have already been adjudicated, and the Idaho forfeiture proceedings are part of a comprehensive adjudication.  Only federal rights are at issue,

and, unlike in the SRBA, no other water right holders are joined.  As in *Dugan*, the McCarran Amendment does not permit the United States' joinder to this type of "private suit to determine water rights solely between" the United States and the State.  *Dugan*, 372 U.S. at 618.  The McCarran Amendment's waiver of sovereign immunity "for the adjudication of rights to the use of water of a river system" does not apply to these proceedings and provides no support to the State's actions here.

> **b.**   **The Idaho forfeiture proceedings are not within the McCarran Amendment's waiver of sovereign immunity for administration of water rights**

The McCarran Amendment includes a narrow waiver of sovereign immunity for "the administration of such rights."  43 U.S.C. § 666(a)(2).[13]  This waiver of sovereign immunity has no applicability to the State forfeiture proceedings which are, by their very nature, designed to void those rights, not "administer" them.  As explained above, following adjudication of the United States' water rights, the State has proceeded through a series of legislative amendments changing both the requirements for the United States to hold stockwater rights and the process for forfeiting water rights, all with an eye towards voiding thousands of water rights previously decreed to the United States.  Indeed, *"administer"* is defined as "to manage or supervise the execution, use, or conduct of" and synonyms include "allocate, apportion, deal (out), dispense, distribute, dole out, hand out, mete (out), parcel (out), portion, prorate."  Merriam-Webster

---

[13] "Administration" of water rights applies only if the water rights were first decreed as the result of a comprehensive McCarran Amendment proceeding. *See United States v. Dist. Ct. In & For the Cnty. of Eagle*, 401 U.S. 520, 524-25 (1971) (the administration of water rights under the McCarran Amendment applies only to those water rights that were adjudicated in a comprehensive proceeding meeting the requirements of the McCarran Amendment in the first place); *Orff*, 358 F.3d at 1143 n.3 (same); *United States v. Hennen*, 300 F. Supp. 256, 262-63 (D. Nev. 1968) (same).  "Congress intended a waiver of immunity under subsection (2) [for administration of water rights] only after a general stream adjudication under subsection (1) has been made." *S. Delta Water Agency v. U.S. Dep't of Interior*, 767 F.2d 531, 541 (9th Cir. 1985).

Dictionary.com, https://www.merriam-webster.com/dictionary/administer, (last visited Dec. 14, 2022).  This meaning is wholly antithetical to the concept of termination.

Further, Idaho law has a separate process for administering water rights, by which a "watermaster" is appointed "to distribute the waters of the public stream, streams, or water supply, comprising a water district" in accordance with adjudicated, decreed, permitted, or licensed rights.  I.C. § 42-607; *see* Dan A. Tarlock , Law of Water Rights and Resources, § 7.21 (1941) (describing process by which a decree is proposed and entered, including the appointment of a watermaster).  The new process set forth in Section 42-224 is quite different, however; it is not aimed at administering the United States' decreed rights, but rather seeks to altogether take them away.

This is particularly egregious given that there is no dispute that these rights are in fact being put to beneficial use in the exact manner for which they the SRBA court decreed them. The United States has a long history of obtaining stockwatering rights in the State of Idaho, including in the SRBA, and those rights have always been for the use of livestock owned by federal land grazing permittees.  As noted above, from 1939 until 2017, an Idaho statute had explicitly recognized the right of the United States to hold stockwater rights for use on federal grazing allotments.  I.C. § 42-501 (1939) (repealed 2017).  Challenges to ownership of stockwater rights by the United States because it does not own the stock that drink the water are a recent development.  Idaho's attempts to now forfeit these rights undermines the Idaho state court orders decreeing stockwater rights to the United States for precisely the purpose for which they have been historically used.

Particularly in light of the tortured history here, forfeiture of these decreed rights cannot reasonably be considered "administration" under the McCarran Amendment.  Under Idaho state

law, forfeiture of water rights is disfavored.  IDWR Director Spackman emphasizes this in each of the May 2022 Orders, stating that "[f]orfeiture is disfavored in Idaho law," and quoting the Idaho Supreme Court as saying: "Forfeitures are abhorrent and all intendments are to be indulged against a forfeiture."  Ex. 1 at 5 (quoting *Application of Boyer*, 248 P.2d 540, 544 (1952)).  In fact, forfeiture proceedings – especially successful ones – are rare in Idaho, and typically take the form of adversarial proceedings between competing appropriators.  *See Sagewillow, Inc.*, 70 P.3d at 674 ("This Court has held . . . that abandonments and forfeitures are not favored."); Peter R. Anderson & Aaron J. Kraft, *Why Does Idaho's Water Law Regime Provide for Forfeiture of Water Rights?*, 48 Idaho L. Rev. 419, 421 (2012) ("Idaho courts have long hesitated to declare water rights forfeited"); *id.* at 430-33, 437-39 (reviewing Idaho Supreme Court cases concerning forfeiture, each of which involved competing appropriators).  In clear contrast, administration of water rights under the priority system is neither disfavored nor abhorrent, but instead "just and equitable in its application, and . . . generally and uniformly applied by the courts." *Moe v. Harger*, 10 Idaho 302, 77 P. 645, 647 (1904).  Thus, Idaho law clearly recognizes forfeiture as entirely distinct and separate from administration of water rights.

The State of Idaho's legislative efforts to divest federally-owned water rights appear to be unprecedented, accounting for the scarcity of federal case law considering whether such targeted forfeiture falls within the McCarran Amendment's waiver of sovereign immunity.  But the precedent that exists establishes that Idaho's forfeiture process cannot be considered "administration" under the McCarran Amendment.  As the Ninth Circuit has explained:

> To administer a decree [for McCarran Amendment purposes] is to execute it, to enforce its provisions, to resolve conflicts as to its meaning, to construe and to interpret its language.

*S. Delta Water Agency*, 767 F.2d at 541 (quoting *Hennen*, 300 F. Supp. at 263); *see also San Luis Obispo Coastkeeper v. U.S. Dep't of the Interior*, 394 F. Supp. 3d 984, 994 (N.D. Cal. 2019) (same), *aff'd*, 827 F. App'x 744 (9th Cir. 2020); *Wyoming v. United States*, 933 F. Supp. 1030, 1036 (D. Wyo. 1996) (same).  Here, Defendants are not seeking to "execute" the partial decrees held by the United States, nor "to enforce [their] provisions, to resolve conflicts as to [their] meaning, [or] to construe and to interpret [their] language."  *See S. Delta Water Agency*, 767 F.2d at 541 (citation omitted).  Instead, Defendants seek to void the decrees, not based on any of the provisions or language in the decrees, but based on subsequent statutory requirements imposed by the Idaho legislature after their issuance.

Finally, the conclusion that forfeiture is not "administration" within the meaning of McCarran comports with the rule of statutory construction that waivers of sovereign immunity must be unequivocally expressed, and a "plausible interpretation" is insufficient.  *See*, *e.g.*, *United States v. Lewis Cnty.*, 175 F.3d 671, 677-78 (9th Cir. 1999) (waiver of sovereign immunity for "'taxation' does not *unequivocally* include the assessment of interest and penalties").  This rule is particularly robust where the application of state law to federal property pursuant to an alleged implied waiver of sovereign immunity could frustrate Congressional purposes, such as that expressed by Congress in the various statutes authorizing the federal grazing program on BLM and NFS lands.  *See id*. at 678; *infra* at 3-4.  Here, it simply is not the case that "administration," as used in the McCarran Amendment, can be "unequivocally" construed to include the Idaho forfeiture proceedings.  Because Congress has not unequivocally indicated any intent to expose federally-held decreed water rights to the systematic post-hoc forfeiture attempted by Idaho here, the McCarran Amendment's waiver of sovereign immunity does not apply.

**3.      The Recent Changes to Idaho Water Law Impermissibly Interfere with, Restrict, and Seek to Divest the United States of its Property Rights, in Violation of the Property Clause of the U.S. Constitution**

The Property Clause of the U.S. Constitution specifies that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST. art. IV, § 3, cl. 2.   Only Congress has this power to dispose of federal property, and any such disposition can occur only by the authority and in the manner authorized by Congress.   *E.g.*, *Kern Copters, Inc. v. Allied Helicopter Serv., Inc.*, 277 F.2d 308, 313 (9th Cir. 1960) (internal citations omitted). The Supreme Court, in fact, has consistently recognized the power conferred to the federal government under the Property Clause over use of its own property to be expansive and "without limitations."   *Kleppe*, 426 U.S. at 539 (citations omitted); *see also Shannon*, 160 F. at 875.

The State has not identified, and cannot identify, any Congressional authority to support its dissolution of federal property rights attempted here.   These water rights are being used by the United States in the exact manner for which they were acquired by and decreed to it as property interests by the SRBA court.   Now, however, the State has retroactively changed its water laws to attempt to forfeit federal property rights previously recognized as valid by an Idaho court under Idaho's state laws.

The retroactive nature of the State's legislation distinguishes it from routine operation of state water laws and demonstrates that the State is attempting to take federal property without congressional authorization.   The Ninth Circuit has recognized that retroactive changes to a state's water right forfeiture laws can unconstitutionally take property.   *See United States v. Orr Water Ditch Co.*, 256 F.3d 935, 942 (9th Cir. 2001) (noting that the State of Nevada had acted reasonably in exempting existing water rights from a novel forfeiture statute because the new

statute "made water rights more precarious," and therefore "could work unfairly," or even

"unconstitutional[ly]" if applied to existing rights); *see also Bowen v. Georgetown Univ. Hosp.*,

488 U.S. 204, 223 (1988) (Scalia, J., concurring) ("Retroactive legislation has always been

looked upon with disfavor.").

Here, where federal authority over use of its own property is "without limitations,"

*Kleppe*, 426 U.S. at 539, this rationale is all the more compelling, and the protections provided

by the Property Clause prohibit Idaho's termination of federally-owned property.  Idaho simply

lacks congressional authorization to divest the United States of its property interests decreed in

the SRBA under the guise of forfeiture, where, as here, there has been no change in the

underlying use of these federally-owned rights, the use comports with the statutory grazing

scheme approved by Congress, and the proceedings fail to comply with the McCarran

Amendment (as discussed above).

For these reasons, these statutory changes impermissibly interfere with, restrict, and seek

to divest the United States of its property rights, in violation of the Property Clause of the United

States Constitution.[14]

4.       **The Revised Idaho Statutes Violate the Contract Clause of the United States
         Constitution.**

As explained above, *infra.* at 5-8, most of the federal stockwater rights at issue here were

decreed by the SRBA court, and many of these were decreed in accordance with settlement

agreements reached and executed by the United States and other parties.

The Contract Clause, U.S. Const., Art. I, § 10, cl. 1, provides that "no State shall … pass

any . . . Law impairing the Obligation of Contracts . . . ."  The Clause applies to any kind of

---

[14] As explained below, the Idaho Constitution also prohibits retroactive statutes with impacts
such as those here.

contract, *see Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018),  and includes both settlement

agreements and consent decrees. *See Rufo*, 502 U.S. at 378 ("A consent decree no doubt

embodies an agreement of the parties and thus in some respects is contractual in nature."); *Local

No. 93*, 478 U.S. at 519 (finding consent judgments to be "hybrids" of both contracts and

judgments); *Long Island Lighting Co.*, 14 F. Supp. 2d at 267 (applying Contract Clause to

settlement agreements).

The Supreme Court has established a two-step test to determine if a law affecting pre-

existing contracts "crosses the constitutional line."  *Sveen*, 138 S. Ct. at 1821.  "The threshold

issue is whether the state law has 'operated as a substantial impairment of a contractual

relationship,'" considering such factors as "the extent to which the law undermines the

contractual bargain, interferes with a party's reasonable expectations, and prevents the party

from safeguarding or reinstating his rights."  *Id.* at 1821–22 (citations omitted).  Then, "[i]f such

factors show a substantial impairment, the inquiry turns to the means and ends of the

legislation," such as "whether the state law is drawn in an 'appropriate' and 'reasonable' way to

advance 'a significant and legitimate public purpose.'"  *Id.* at 1822 (citations omitted).

Applying this test, the revised Idaho statutes impose a substantial impairment on a

contractual relationship.  The federal government, the State, and other water users in the SRBA

entered into settlements, which were then formalized in judicial decrees that declared certain

stockwater rights were held by the United States.  S.B. 1305, by declaring those same rights to be

appurtenant to the permittee's base property, entirely undermines that "contractual bargain" and

is completely antithetical to the federal government's reasonable expectations when it settled

those claims.

Further, there is no "significant and legitimate public purpose" in the wholesale divestment of federal stockwater rights.  To the contrary, as discussed below in Section V.6. discussing the United States' entitlement to permanent injunctive relief, strong policy reasons favor the retention of these rights in federal ownership, in support of the federal grazing program – particularly as to those rights that were settled or decreed in the SRBA.

**5**.     **The Revised Idaho Statutes Violate the Retroactivity Clause of the Idaho Constitution.**

The Retroactivity Clause of the Idaho Constitution provides that "[t]he legislature shall pass no law for the benefit of a railroad, or other corporation, or any individual, or association of individuals retroactive in its operation."  Idaho Const. art. XI, § 12.   A law is retroactive "when it operates upon . . . rights which have been acquired . . . prior to its passage." *Frisbie*, 457 P. 2d at 411.[15]  Here, the challenged legislation violates the Retroactivity Clause for numerous reasons.

First, Idaho Code § 42-113(2)(b) makes existing stockwater rights held by the United States appurtenant to the grazing permit holder's base property and transferable by the base property owner.  However, the SRBA court previously decreed thousands of these rights to the United States without placing these limitations on the rights.  This legislation therefore unlawfully seeks to unilaterally shift their control to the base property owner and change the nature of these rights, acquired prior to the passage of this legislation, by making them appurtenant to private property rather than the federal lands comprising their places of use.  That is plainly unlawful under Idaho's Constitution.

---

[15] In addition, Section 73-101, Idaho Code, provides that no part of the Idaho Code "is retroactive, unless expressly so declared."  The legislation at issue herein does not expressly declare that is it retroactive, yet it is being applied to property rights of the United States retroactively.

Second, Idaho Code §§ 42-222(2) and 42-224 authorize forfeiture of thousands of stockwater rights decreed to the United States in the SRBA through a newly-created forfeiture proceeding based on a legal theory that is contrary to the Final Unified Decree.  The Final Unified Decree previously recognized the validity of these rights based upon stockwatering use by federal permittees.  However, the United States is now subjected to forfeiture of these rights based solely upon a legislative change that no longer deems such usage to constitute beneficial use, unless IDWR "has or receives written evidence signed by the principal and the agent, prior to issuance of an Order to Show Cause," that an agency relationship exists.  I.C. § 42-224(4)) .  By imposing a condition on the validity and continued existence of these rights that did not exist at the time they were decreed, this legislation unlawfully allows a retroactive invalidation of these rights based upon a change in the law enacted subsequent to their judicial confirmation.  *See Frisbie*, 457 P.2d at 411 (a law is retroactive if it "operates upon transactions which have been completed or upon rights which have been acquired . . . prior to its passage.").  In *Matter of Hidden Springs Trout Ranch*, *Inc.*, 636 P.2d 745, 746-47 (Idaho 1981), the Idaho Supreme Court held that a change in the law could be applied to a water permit application without resulting in an impermissible retroactive application of the statute because a water right permit gives the applicant no vested property right.  However, the court specifically distinguished the permit application from an "adjudicated right," suggesting that its result would be different if the right had been fully adjudicated as have the federal water rights at issue here.  *Id.* at 747.

Third, the Idaho legislation states that stockwater rights held by federal agencies or permittees "shall never be utilized for any purpose other than the watering of livestock on the federal grazing allotment that is the place of use for that stockwater right." I.C. § 42-504.  This provision again places a retroactive limitation on thousands of rights decreed to the United States

that does not apply to rights held by non-federal parties and that did not exist at the time of issuance of the Final Unified Decree.

Finally, Idaho law provides that "when any right to the use of water shall be lost through . . . forfeiture[,] such rights to such water shall . . . be again subject to appropriation."  I.C. § 42-222(2).  Therefore, forfeiture of the United States' stockwater rights would benefit other water users by making the water currently subject to those federal stockwater rights available for appropriation by third parties.  By operating retroactively for the benefit of other water users through forfeiture of the United States' previously-obtained water rights and placing limits on those right that did not exist when they were decreed, Idaho Code §§ 42-222(2) and 42-224 violate the Retroactivity Clause of the Idaho Constitution.

### 6.     The United States Is Entitled To Permanent Injunctive Relief.

In *Winter v. Natural Resource Defense Council*, the Supreme Court held that, to obtain a preliminary injunction, a plaintiff must demonstrate (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm absent a preliminary injunction; (3) that the balance of equities tips in the plaintiff's favor; and (4) that injunctive relief is in the public interest.  *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  The standard for a permanent injunction is essentially the same, except that to obtain a permanent injunction, the party seeking the injunction must have prevailed on the merits.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12(1987).   The United States satisfies all of these prongs for permanent injunctive relief and the Court should therefore permanently enjoin application of the Idaho legislation described above, codified in Idaho Code sections 42-113(2)(b), 42-222(2), 42-224, 42-501, 42-502, and 42-504, to the United States or its agencies.

a.   **The forfeiture proceedings will result in significant negative impacts to the federal grazing program and will limit the availability and use of water on federal lands.**

The implementation of the above-described Idaho statutes will result in significant negative impacts to the federal grazing program.  If stockwater rights on federal lands are forfeited or become appurtenant to base property, as the recently-enacted legislation requires, the harms to the agencies and their permittees will be significant.  The agencies will no longer control the water needed for privately-owned stock that are permitted to graze on federal grazing allotments.  Particularly in circumstances where multiple permittees share an allotment, which is common in Idaho, or in the event of resource shortages, the availability of stockwater under federally-held rights is essential to allow effective land management, for the protection of sensitive areas, to spread livestock across allotments as needed for forage, and to allow for management of livestock that may congregate at particular water sources.  Price Decl. ¶¶ 17, 18, 29-38; Conant Decl. ¶¶ 8, 14, 15, 18, 19.

Federal ownership of stockwatering rights allows use of water by all permittees, not just a single permittee.  Further, the vast majority of grazing permittees in Idaho have not filed for water rights, and rely on the government to hold the rights and provide water for stock.  Conant Decl. ¶ 12; Price Decl. ¶ 20.  The loss of federal rights could allow one permittee to prevent water use by others, Conant Decl. ¶ 18; Price Decl. ¶¶ 34, 35, and, for allotment areas where the United States is the only water right holder the applicability of the challenged statutes and forfeiture of the United States' water rights would, absent an injunction, completely terminate the only stockwater rights that provide water for the United States' permittees.

The loss of federal rights would likely result in stockwater rights being held solely by private parties, which, in turn, could result in a permittee preventing water use by a successor

permittee, or requiring payment from the successor to use the water.  Private ownership of the waters used on federal grazing allotments could also result in the dewatering of the federal lands, rendering the lands useless for future grazing.  Such adverse impacts could significantly undermine the federal grazing program mandated by Congress by depriving federal permittees of access to water needed to sustain their ranching operations, which in turn would be detrimental to the socio-economic stability of local communities and the State.

Nor is this just a theoretical concern.  In Nevada,[16] for example, ranchers have sought approval to move and use their privately-owned stockwater rights off of federal lands (*i.e.*, by transferring the water to the permittee's own land).  Specifically, in July 2018, a private rancher, Wayne N. Hage, filed applications with the Nevada State Engineer seeking to change his point of diversion and place of use of numerous stockwater rights that are on federal allotments. Application 88145 (Ex. 3) and Application 88146 (Ex. 4), with supporting maps.  Those applications sought to transport the water across National Forest System lands and BLM-administered public lands via pipelines that are many miles long to Mr. Hage's private property.  *Id.* at p. 2.  In August 2019, the Nevada State Engineer granted the applications, which put tens of thousands of acres of federal grazing allotments in the Humboldt-Toiyabe National Forest and on public lands at risk of being dewatered and likely unsuitable for future grazing for all time.  *See* Permits 88145 (Ex. 5) and 88146 (Ex. 6).  The challenged Idaho legislation poses a similar threat to the federal grazing program by seeking to place stockwater rights solely in

---

[16] Nevada previously adopted discriminatory laws against the United States pertaining to stockwater rights; however, the State changed those laws following a successful challenge by the United States to the Nevada Supreme Court.  *See* Nev. Rev. Stat. § 533.503; *United States v. State Eng'r*, 27 P.3d 51, 54 (Nevada 2001) (per curiam).

private hands and deprive the federal government of its long-held water rights needed to support grazing by its permittees.

In addition, the Idaho legislation could negatively impact water development opportunities.  Some stockwater rights are dependent on infrastructure financed by federal funding, but federal funding may not be available for water infrastructure development or maintenance if no underlying federal water rights exist.  For example, in 2012, BLM established a policy (now expired) in Nevada that generally prohibits expenditure of public funds for construction and infrastructure development where the water right is solely owned by non-BLM entities.  *See, e.g.*, BUREAU OF LAND MGMT., Instruction Memorandum No. NV IM-2013-007 (Dec. 19, 2012) (available at https://www.blm.gov/policy/nv-im-2013-007, last visited Dec. 15, 2022).  Such policies make practical sense, as the BLM may not be willing to build water infrastructure improvements, such as livestock watering troughs or water pipelines, if it lacks federally-owned water rights that may provide the water that can be used and transported through such improvements.  Price Decl. ¶¶ 19, 38; Conant Decl. ¶ 19.c.  Indeed, although water pipelines are often employed to support the needs of livestock in the arid climate of Idaho and over the vast distances associated with many BLM allotments, Price Decl. ¶ 13.b, those pipelines need dependable water supplies to fill them.  If the Idaho forfeiture legislation is not permanently enjoined, dependable federal water supplies will be jeopardized, and the BLM and other federal agencies may simply lack the water rights needed to incentivize continued investments in such improvements.

Already, the new legislation is having negative impacts in Idaho.  Because of this legislation, the Forest Service is unable to obtain final state approval and use a fully-completed stockwater development, financed with federal money in reliance on IDWR's prior approval of a

water right Permit for the project.  Conant Decl. ¶ 18. Similarly, IDWR is denying approval of

BLM stockwater developments.  Price Decl. ¶ 25.   Ultimately, these complications are likely to

lead in a wholesale reduction in the scale of the federal grazing program and the associated loss

of federal grazing fees, as the loss of federally-owned water rights would result in a reduction in

the number of cattle that can be supported on the federal range.  Moreover, the Taylor Grazing

Act requires that a percentage of grazing fees be paid to the State in which the federal lands are

located, 43 U.S.C. § 315i,  and the Federal Land Policy and Management Act requires that a

portion of the fees fund range improvements to rehabilitate and protect such lands, 43 U.S.C. §

1751(b)(1).   Loss of grazing fees thus harms not only the United States but also the State of

Idaho and the public in general.

Beyond this, the very pendency of these unlawful proceedings creates uncertainty for

federal grazing permittees who rely on federally-owned stockwater rights, and requires them to

invest time and money to protect their interests.  Although *Joyce Livestock* allowed grazing

permittees to obtain stockwater rights in their own names based on their livestock's consumption

of water on federal lands, many federal permittees prefer to rely on water rights held by the

federal land management agencies to ensure their legal access to stockwater.  Price Decl. ¶¶ 20,

23; Conant Decl. ¶ 12.  These permittees must monitor the ongoing proceedings before the

IDWR to see what precedent those proceedings may set for the water rights on which they

depend and must decide whether to take protective steps such as entering into a principal-agent

relationship with the federal agency or seeking their own stockwater rights.  *See* I.C. § 42-224(4)

("[T]he director shall not issue an order to show cause where the director has or receives written

evidence signed by the principal and the agent, prior to issuance of said order, that a

principal/agent relationship existed during the five (5) year term mentioned in subsection (1) of

this section or currently exists between the owner of the water right as principal and a permittee or lessee as agent for the purpose of obtaining or maintaining the water right."); *see also* Price Decl. ¶ 28 (noting that 554 BLM permittees have recently entered into agreements establishing such principal-agent relationships). In the event that similar proceedings are initiated against the specific federal water rights on which the permittees depend, the permittees may need to participate actively in the proceedings in order to protect their interests and avoid forfeiture of these rights. *See* I.C. § 42-224(10) ; *see also id.* § 42-224(4) (requiring IDWR to provide a copy of the show-cause order "to the holder or holders of any livestock grazing permit or lease for said lands").

Finally, implementation of these laws could also result in additional cattle trespasses in furtherance of efforts to secure water rights. In some instances, private parties have attempted to use their ownership of stockwater rights to negate federal control of livestock grazing on federal lands. For example, after the United States brought a trespass action for unauthorized grazing on Forest Service and BLM allotments in Nevada, the defendant argued that his stockwater rights on the federal land gave him the right to graze federal lands without a grazing permit or the payment of grazing feed. *United States v. Est. of Hage*, 810 F.3d 712, 715 (9th Cir. 2016). Although the Ninth Circuit rejected that claim, 810 F.3d at 717-18, the Idaho legislation and its targeting of federal stockwater rights is likely to lead to similar conflicts.

> **b.   The balance of equities and the public interest support an injunction.**

In considering the remedy of an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotations and citations omitted). "To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the []

injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999) (citation omitted).  The Court must then weigh "the hardships of each party against one another." *Id*.  And, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences" that would issue from an injunction.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

The United States has demonstrated that the balance of harms clearly favors an injunction and that injunctive relief is in the public interest.  In fact, the State of Idaho and IDWR do not face any injury.  The stockwater rights at issue have been decreed for many years, and the waters are being used by federal permittees.  Entering a permanent injunction against implementation of the challenged statutes preserves the status quo and creates no injury to the State.

As explained above, thousands of decreed water rights may ultimately be at risk.  Many of these rights were obtained only after decades of litigation and the concomitant time and expense that went into those adjudications.  Now, many years after issuance by the SRBA court decrees that conferred property rights on the United States, the Idaho legislature has changed applicable state law in an attempt to negate the state court action, all without any showing of a change in the use of the underlying stockwater rights.

Public policy also strongly supports continued federal ownership of stockwater rights to support the federal lands grazing program.  Not only has Idaho state law historically supported federal ownership of stockwatering rights, as discussed above, but decreeing the water rights to the United States protects the grazing program in the West and benefits the ranching community as a whole, as well as the general public.  The United States seeks to fulfill the directives of Congress by securing vested water rights for the benefit of the owners of livestock that graze on the federal grazing allotments.  Ownership of stockwatering rights allows federal land

management agencies to effectively manage and administer the federal lands for grazing use, in the public interest as Congress has directed.

The importance of federal ownership of stockwatering rights has been recognized throughout the West.  Many of the policy issues present here were addressed in *Department of State Lands v. Pettibone*, 702 P. 2d 948 (Mont. 1985).  In that case, the Supreme Court of Montana recognized that in the arid regions of the American West, "the control of water means the control of the land itself."  *Id*. at 955.  The court held that title to water rights appurtenant to school trust lands administered by the State must vest in the State.  Although, as the court noted, "school trust lands are subject to a different set of rules than other public lands," *id*., that "different set of rules" does not prevent the application of *Pettibone's* rationale to federal lands.

As in *Pettibone*, the public lands of the United States are held in trust for the public. *Light v. United States*, 220 U.S. 523, 537 (1911) (citation omitted).  Livestock grazing, and the use of water directly from stream and spring sources, benefit the federal lands and fulfill Congressional directives.  Restricting and divesting the United States of its decreed water rights will interfere with the ability of the United States to manage and administer public grazing lands, as directed by Congress, for the benefit of the public.  Simply put, the balance of equities and public interest support an injunction.

## VI.    CONCLUSION

By their explicit terms, the Idaho statutes at issue here single out and discriminate against the United States, imposing restrictions on ownership and use of stockwater rights that apply only to federally-owned stockwatering rights or stockwater rights used on federal lands, thereby violating the Supremacy Clause of the United States Constitution.  In addition, no waiver of sovereign immunity exists to support the State forfeiture proceedings targeting federal property.

Finally, the Idaho statutes also violate the Property and Contract Clauses of the United States

Constitution and the Retroactivity Clause of the Idaho Constitution.  Accordingly, the Court

should grant summary judgment in favor of the United States and find that the statutes are

unlawful as applied against the United States.  Further, the United States has demonstrated

entitlement to a permanent injunction barring Idaho from taking any action whatsoever to

enforce these statutes against the interests of the United States.

      Respectfully submitted, this 16th day of December, 2022.

> JOSHUA D. HURWIT
> United States Attorney
> CHRISTINE ENGLAND
> Assistant United States Attorney
>
> TODD KIM
> Assistant Attorney General
> U.S. Department of Justice
> STEPHEN G. BARTELL
> Assistant Chief
> THOMAS K. SNODGRASS
> Senior Attorney
> /s/  *David L. Negri*
> DAVID L. NEGRI
> U.S. Department of Justice
> c/o United States Attorney's Office
> 1290 West Myrtle Street, Suite 500
> Boise, ID 83702
> (208) 334-1936